# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>SAMSUNG smartphone Model Number SM-A205U,<br>International Mobile Equipment Identity (IMEI)<br>355720107017133 | )<br>)<br>) Case No. 1:19mj 398<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A

located in the _____ Middle _____ District of _____ North Carolina _____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1956(a)(1), 1956<br>(h), 21 U.S.C. §§ 841(a)(1),<br>846, and 843(b) | Money laundering, money laundering conspiracy, conspiracy to distribute a<br>controlled substance and the possession of a controlled substance with the intent<br>to distribute, use of a communication facility |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

David Walker, DEA TFO
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/26/19

_____
*Judge's signature*

City and state: Greensboro, NC

L. Patrick Auld, U. S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

The property to be searched is a SAMSUNG smartphone Model Number SM-A205U, International Mobile Equipment Identity (IMEI) 355720107017133, hereinafter the "Device." The Device is currently in the custody of the affiant, in the Middle District of North Carolina.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1.   All records on the Device described in Attachment A that relate to violations of 21:846 and 841(b)(1)(A) and (b)(1)(B) and involve Francisco Javier OCHOA, Jr., since March 2017, in the form of:

   a. information describing lists of customers and related identifying information;

   b. information describing types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   d. any information recording OCHOA's schedule or travel from March 2017 to December 2, 2019;

   e. all bank records, checks, credit card bills, account information, and other financial records.

2.   Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

24

# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF  ) | |
| SAMSUNG CELLULAR TELEPHONE  ) | **1:19mj** _398_ |
| MODEL NUMBER SM-A205U  ) | |
| CURRENTLY LOCATED AT DEA  ) | |
| RALEIGH DISTRICT OFFICE  ) | |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH

### WARRANT

I, David M. Walker, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.  I am a "Federal Law Enforcement Officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am a Task Force Officer with the U.S. Drug Enforcement Administration (DEA) and have been since May of 2010. I have been a sworn law enforcement officer in the

1

State of North Carolina for since 1999. I graduated from Mountain State University with a Bachelor of Science degree in Administration of Criminal Justice. I was employed by the Durham Police Department from 1999 to 2015 as a sworn law enforcement officer. Past assignments include Patrol Officer in the Uniform Patrol Division, Crime Area Target Team, Gang Resistance Unit, Special Operations Division Interdiction Unit and Selective Enforcement Team. I am currently employed as an investigator for the Orange County Sheriff's Office located in Hillsborough, NC, which is in the Middle District of North Carolina. I have also conducted and or assisted in numerous criminal investigations to include homicide, money laundering, gambling, prostitution, larceny, assaults (simple and serious), and violations of the Controlled Substances Act. I am familiar with the customary practices, procedures, tactics, and terminology used by persons engaged in the business of transportation, manufacturing, selling, and distributing controlled substances. I have conducted and assisted in numerous narcotics investigations ranging from street corner narcotic sales to narcotic traffickers. During the aforementioned investigations I have participated directly or, indirectly in numerous controlled purchases of narcotics, undercover narcotics purchases, and covert surveillance of suspected drug dealers. Through investigations and training, I have

become familiar with the types and amounts of profits made by narcotics dealers and the methods, language and terms which they use to disguise the source and nature of the profits from their illegal narcotics trafficking. In 2010, I was assigned to the U.S. Drug Enforcement Administration (DEA) in Raleigh, North Carolina as a Task Force Officer. The DEA Task Force is comprised of DEA intelligence analysts, agents, investigators and detectives from several jurisdictions throughout North Carolina including the North Carolina State Bureau of Investigation (SBI), Wake County Sheriff's Office, Durham Police Department, Raleigh Police Department, Wayne County Sheriff's Office, Wilson Police Department, Harnett County Sheriff's Office, Office, Greenville Police Department, Cary Police Department, Person County Sheriff's Office, Lenoir County Sheriff's Office, North Carolina National Guard, North Carolina Highway Patrol and the Rocky Mount Police Department. The DEA Task Force is charged with conducting multi-jurisdictional investigations of large-scale narcotics traffickers. While assigned with the DEA, I have participated in numerous wiretap investigations concerning the unlawful importation, possession with intent to distribute, and distribution, of controlled substances, the laundering of monetary instruments, monetary transactions in property derived from specified unlawful activities, and conspiracies associated

therewith state and federal narcotics laws. Through investigations and training, I have become familiar with the types and amounts of profits made by narcotics dealers and the methods, language and terms which they use to disguise the source and nature of the profits from their illegal narcotics trafficking.

3.    This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1956(a)(1), 1956(h), 21 U.S.C. §§ 841(a)(1), 846, including attempt, have been committed by Francisco Javier OCHOA Jr, and others known and unknown.

## IDENTIFICATION OF DEVICE TO BE EXAMINED

4.    The property to be searched is a SAMSUNG smartphone Model Number SM-A205U, International Mobile Equipment Identity (IMEI) 355720107017133, hereinafter the "Device." The Device is currently in the custody of the affiant, in the Middle District of North Carolina.

## THE SUBJECT OFFENSES

18 U.S.C. § 1956(a)(1) – Money laundering.

18 U.S.C. § 1956(h) – Money laundering conspiracy.

21 U.S.C. §§ 846 and 841 (a)(1) – Conspiracy to distribute a controlled substance and the possession of a controlled substance with the intent to distribute, respectively.

21 U.S.C. § 843(b) - Using a communication device to facilitate the distribution of a controlled substance.

## INVESTIGATIVE BACKGROUND

5. On November 14, 2018, Agents and Officers assigned to the Drug Enforcement Administration Raleigh District Office initiated an investigation into the distribution of cocaine hydrochloride (HCL) and other illegal drugs near the University of North Carolina at Chapel Hill, NC (UNC).

## PROBABLE CAUSE

6. In February 2019, Carrboro Police Investigator Ward and Chapel Hill Police Investigator Farrell met with cooperating Defendant, hereinafter referred to as CD1. CD1 was cooperating with investigators in hopes that such cooperation would receive consideration in regards to potential criminal charges. CD1 was involved in cocaine HCL, and other illegal drug distribution at a fraternity associated with UNC-Chapel Hill.

7. CD1 advised them that Andrew GADDY was selling illegal narcotics, specifically, cocaine, marijuana and pills, in Chapel Hill and Carrboro, NC. CD1 stated that GADDY had multiple locations in which he sold

and stored illegal narcotics as well as money made from drug distribution. Carrboro and Chapel Hill Police Investigators continued investigating and through controlled purchases of illegal drugs, surveillance, and other investigative means, GADDY's residence and other locations associated with drug distribution were identified.

8.  On March 22, 2019, search warrants were approved by an Orange County, NC District Court Judge for residences associated with GADDY: 200 Lloyd Street, Carrboro, NC (GADDY's address); 201 S. Elliott Road (GADDY'S father's address), Apt. 344, Chapel Hill, NC; and 105 N. Hassel Street, Hillsborough, NC (GADDY's mother's address).

9.  CD1 received information from GADDY that day that GADDY would be picking up a package of cocaine on March 22, 2019. This prompted investigators to establish surveillance on GADDY. Investigators followed GADDY and Mary TRAN to the Estes Drive Post Office Chapel Hill, NC where they observed GADDY retrieve a package. TRAN is GADDY's girlfriend. GADDY returned to 200 Lloyd Street, Carrboro, NC where GADDY and TRAN were detained. Search warrants were executed at 200 Lloyd Street, Carrboro, NC; 201 S. Elliott Road, APT 344, Chapel Hill, NC; and 105 N. Hassel Street, Hillsborough, NC. A United Stated Postal Service box was seized from the back seat of the Honda that contained approximately 394 grams of suspected cocaine.

Investigators seized an additional 48 grams of suspected cocaine from the closet in TRAN's bedroom inside 200 Lloyd Street. TRAN is the leaseholder at 200 Lloyd Street. Investigators seized approximately 15.75 pounds of marijuana, $17,775 cash, 189 Xanax pills, numerous steroid pills, other steroids, human growth hormone, other narcotics, a handgun and a bullet resistant vest in TRAN's bedroom and closet.

10. Orange County Sheriff's Investigators seized approximately 133 pounds of marijuana, a rifle, approximately $10,000 cash and other items from 105 N. Hassel Street, Hillsborough, NC.

11. No contraband or evidence was located at 201 S. Elliott Road, APT 344, Chapel Hill, NC.

12. GADDY was charged with multiple violations of the North Carolina Controlled Substance Act.

13. The United Stated Postal Service box seized from GADDY that contained approximately 394 grams of suspected cocaine was addressed to Robert Gaddy at PO Box 9320, Chapel Hill with a return address of 3312 Fowler Road, Ceres, California. Investigator Ward requested assistance from the United States Postal Inspection Service. The suspect box was shipped to GADDY from the Ceres, California Post Office on March 21, 2019. Investigator Ward identified Francisco Javier OCHOA as the probable sender of the box containing suspected cocaine. This tentative

identification was done comparing time stamps on the postage receipt with video images from the Ceres, California Post Office from March 21, 2019. This information was also further cross-referenced with 2700 Chahalis Way, Ceres, California. This address was found from GADDY's cellular handset when examined by Investigator Ward pursuant to a search warrant authorized by a North Carolina Magistrate. Law enforcement intelligence information showed Francisco Javier OCHOA as being associated with 2700 Chahalis Way, Ceres, California. A photograph of OCHOA matches the person observed on video images from the Ceres, California Post Office from March 21, 2019 at the time the parcel was shipped.

14. On August 6, 2019, Special Agent (SA) Matthew Futch and your affiant conducted an interview of Cooperating Defendant 2, hereafter referred to as CD2.

15. CD2 was cooperating with investigators in hopes that such cooperation would receive consideration in regards to potential criminal charges. CD2 was involved in the distribution of cocaine, marijuana and other illegal drugs for over two years beginning in approximately 2017. One of CD2's sources for cocaine HCL was Travis LNU. CD2 was shown a photograph of Travis Michael EVANS. CD2 identified EVANS as his source for cocaine HCL. CD2 stated EVAN's Snapchat username is

"Travisgraffius". EVANS was the source of CD2's first quarter-pound (4 ounces) of cocaine. CD2 would meet EVANS at Franklin Street Chapel Hill, NC hotels with unidentified white males who knew Hispanic sources of cocaine. Eventually, CD2 cut out the unidentified white males and EVANS. CD2 explained that at this point, CD2 dealt with the Hispanics directly, specifically a male CD2 knows as "Frankie". CD2 was shown a photograph of Francisco Javier OCHOA. CD2 identified OCHOA as the person CD2 knew as "Frankie". CD2 further explained that EVANS obtained his controlled substances through OCHOA and EVANS would also serve as middleman or broker.

16. CD2 obtained approximately two (2) kilograms of cocaine and up two hundred (200) pounds of marijuana from OCHOA per week. CD2 believed marijuana came from OCHOA and cocaine was obtained through OCHOA's father. CD2 has never met OCHOA's father, however, he has seen him during a FaceTime call. CD2 has associated with OCHOA for approximately two (2) years. Kilograms of cocaine through OCHOA cost approximately $32,000.00 at first and eventually dropped to approximately $22,000.00. OCHOA currently resides in California, however, has come to North Carolina. CD2 utilized the Postal Service to send United States Currency (USC) to OCHOA. USC was sent to addresses to include 2600 Chahallis Way Ceres, California. When

sending money to the Ceres, California address, the package was addressed to OCHOA's wife, who CD2 knows as Mariella ZAVALA.

17.    During the past two (2) years, CD2 estimated he/she has distributed more than one hundred (100) kilograms of cocaine.

18.    CD2 stated that payment for drug sales occurred in various means, to include specifically Venmo. During a Venmo payment, the memo line would read anything that was not drug related to include "dinner," "rent," and "shoes." This was done to conceal the purpose of the transaction from Venmo as Venmo would not allow their service to be utilized for drug payments.

19.    CD2 stated when he/she sent cash to OCHOA in Ceres, California to the name Mariela ZAVALA. CD2 would band money together in $1,000.00 increments. Money would be placed in vacuum-sealed bags for shipment. Each vacuum sealed bag could hold approximately $50,000.00. Money was shipped to OCHOA approximately every one to two weeks.

20.    On August 26, 2019, Special Agent (SA) Matthew Futch, United States Postal Inspector Dustin Holland, and I conducted a debriefing of CD2.

21.    CD2 stated CD2 has observed a brick press at EVANS' residence in Mebane, North Carolina. Furthermore, CD2 stated EVANS and his

associates have multiple guns to include assault rifles and shotguns along with body armor.

22. A photograph of a female was shown to CD2, whom CD2 identified as "Bri", subsequently identified as Briahna HASKELL. CD2 stated HASKELL's telephone number was 336-269-2662. CD2 knows HASKELL as EVANS's romantic partner. CD2 stated CD2 gave money to HASKELL for payment to EVANS in one (1) instance. CD2 stated the amount of money was $130,000.00. This money was for a controlled substance debt where EVANS was the middleman to OCHOA and took place approximately one year ago. CD2 gave the money to HASKELL in a duffle bag at the house EVANS and HASKELL shared in Durham, North Carolina near South Point Mall. CD2 stated HASKELL was aware the money was drug related and that HASKELL has been present when CD2 and EVANS have discussed drugs and conducted drug transactions.

23. A photograph of a male was shown to CD2, whom CD2 identified as "Frankie", later identified as OCHOA. CD2 stated OCHOA is known to change phone numbers frequently and usually uses telephones with a 209 area code.

24. On December 2, 2019, OCHOA was arrested in Turlock, California, by members of the Fugitive Task Force for the United States Marshal's

Service for the Eastern District of California. The arrest was made pursuant to a warrant, issued upon an indictment returned by the grand jury in the Middle District of North Carolina (MDNC), on November 25, 2019. The indictment alleges conspiracy to distribute cocaine hydrochloride and marihuana, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) and (b)(1)(B). The Device was recovered from OCHOA's person during his arrest. Approximately one pound of marijuana was also recovered from the vehicle OCHOA was driving during his arrest.

## DIGITAL EVIDENCE

25. On March 23, 2019, Investigator Ward of the Carrboro Police Department applied for and was granted a search warrant to examine and collect digital evidence from two cellular telephones seized from GADDY. Investigator Ward provided your affiant with a copy of the extracted data from these cellular handsets.

26. Analysis of the information provided from the black cellular handset seized from GADDY shows this device was used to facilitate poly drug distribution. Screenshots of text message communications from 29 contacts using the iPhone iMessage platform were, based on my training and experience communications related to drug distribution. These conversations used terminology commonly used for drugs such as "blow,"

"snow," "special k," "molly," "sheet," "bars," "shrooms," "white," and "bud."

27.    There are also multiple threads of GADDY directing customers to send payment for these coded items through Venmo, PayPal, and money order. GADDY describes money orders as being anonymous.

28.    From the two phones that were seized from GADDY in March 2019, there are multiple screenshots of Snapchat messages and Wickr chats that I believe are connected to OCHOA and ZAVALA. GADDY's cellular telephone contained a screenshot of a Wickr chat between monikers *lordfarqua* (GADDY) and *subway209*. The user of *subway209* tells *lordfarqua* "K but I sent you super fire weed you'll see", then "3911 belleza dr Ceres ca 95307", and finally "Mariela Zavala".

29.    There are also screenshots of Snapchats between GADDY and accounts *Javier Ochoa* and *Frankie&&M@riela*, both of these are believed to be OCHOA and or ZAVALA. In the Snapchats, GADDY was passed multiple addresses in Ceres, California.

30.    Photos from the GADDY's cellular telephones show what I believe to be marijuana, Xanax, sheets of blotter paper containing LSD, MDMA, Butane Hash Oil (BHO), and kilogram quantities of cocaine. There are also photos of GADDY, TRAN, and others. In one photo TRAN and an unidentified white male are holding at least eight large bundles of US

Currency. There are multiple photos of United State Postal Service (USPS) parcels and USPS receipts with tracking numbers. There is also a photograph of "Frankiy Ochoa 2700 Chahalis Way Ceres, California" in handwriting on a USPS packaging. The address of 2700 Chahalis Way, ·Ceres, California 95307 was listed as an account holder information from Wells Fargo bank records from December 2018 for customer Mariela OCHOA. These records list the same date of birth, SSN and drivers license information as ZAVALA.

31. From HASKELL's Snapchat there are screenshots of HASKELL's Venmo account; postal receipts showing parcels regularly being sent to Ceres, California or nearby towns; what I believe to be drug ledgers; and Snapchat messaging chats discussing what I believe to be drug debts. There is also a screenshot of a Wickr text message chat retrieved from HASKELL's Snapchat account the screenshot was sent from HASKELL to an account believed to belong to EVANS. In the Wickr chat *carolinaqueen13* is chatting with *caliking209*. In the chat *carolinaqueen13* is discussing a remaining balance "after the 100k mailed it's down to 73k something". *caliking209* responds "74,500", and then asks "Do you need an address for the rest of the $". CD2 has identified Wickr moniker *caliking209* as being used by OCHOA.

32. From the digital evidence obtained I believe this organization utilizes Snapchat and other text messaging applications that are known for encryption or not maintaining records of text chat content. These applications are known from my training and experience, to be downloaded and used from cellular/smart telephones. I believe the use of these applications is meant to thwart or delay law enforcement. I further believe that the applications are used to coordinate drug shipments, bulk cash shipments, and accounting of illegal proceeds. I believe there are instances of screenshots of these text message applications for members of this conspiracy to maintain records of transactions for accounting purposes. For instance, if HASKELL sends a parcel of bulk currency to OCHOA and others in California, HASKELL photographs the postal receipt with tracking numbers and transmits it via Snapchat to EVANS. EVANS then takes a screenshot of the Snapchat message before it expires in order to preserve a record of the parcel being shipped.

## TECHNICAL TERMS

33. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data

communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.     Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing

the stored images. This storage media can contain any digital data, including, data unrelated to photographs or videos.

c.    Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.   Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.    GPS: A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.   These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna

on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be

assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

34. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

35. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some

period of time on the device. This information can sometimes be recovered with forensics tools.

36. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

38.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution

of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

39.   I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

David M. Walker
Task Force Officer
Drug Enforcement Administration

Sworn and subscribed before me this 26th day of December 2019.

The Honorable L. Patrick Auld
United States Magistrate Judge
Middle District of North Carolina